NEW ENGLAND LEGAL FOUNDATION *vs.* CITY OF BOSTON &
another.[1]

Suffolk. April 2, 1996. - September 24, 1996.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Taxation,* Real estate tax: charity, exemption, assessment. *Statute,*
Construction. *Charity. Corporation,* Non-profit corporation. *Civil Rights,*
Attorney's fees.

Discussion of the provisions of G. L. c. 59, § 57C, second par., and G. L.
c. 60, § 98, setting forth the jurisdictional requirements for a challenge
to a tax assessment; determination of the legislative intent that would
harmonize the provisions of those statutes. [605-608]

A corporation asserting its tax-exempt status under G. L. c. 59, § 5, Third,
timely filed an action to recover back taxes pursuant to G. L. c. 60,
§ 98, within ninety days after the full payment of its final quarterly tax
bill for the tax year in question; however, a second civil action, filed
within ninety days of payment of the third quarterly tax bill but without
prepayment in full of the remaining amount due for that tax year was
properly dismissible for want of jurisdiction under the provisions of
c. 60, § 98. [608-609]

An incorporated public interest law firm that assists in test-case or other
significant litigation for the purpose of vindicating legal rights for the
public good, that does not expend money for any purpose prohibited by
G. L. c. 59, § 5, Third (*a*), and that is not a vehicle for party politics,
demonstrated that it is entitled to tax exemption as a charitable corpora-
tion under the terms of that statute. [609-614]

A charitable corporation that prevailed in an action to establish its tax-
exempt status was not entitled to legal fees pursuant to 42 U.S.C. § 1988
(b), where the State remedy provided under G. L. c. 60, § 98, to recover
back taxes, was adequate. [614-615]

A Superior Court judge was without jurisdiction to order recovery of taxes
paid by a tax-exempt charitable corporation for a tax year for which the
corporation had not timely filed an action under G. L. c. 60, § 98, to re-
cover the taxes. [615-616]

CIVIL ACTIONS commenced in the Superior Court Depart-
ment on April 13, 1993, and July 23, 1993.

The case was heard by *Richard E. Welch III,* J., on mo-

---

[1] Acting commissioner of assessing for the city of Boston.

tions for summary judgment, and a motion for reconsideration was heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Constantine Papademetriou* for the defendants.

*Stephen S. Ostrach* (*Todd S. Brilliant* with him) for the plaintiff.

*Laura Steinberg & Lisa F. Sherman* for Conservation Law Foundation, Inc., amicus curiae, submitted a brief.

LIACOS, C.J. Since 1993, the city of Boston has assessed real property taxes on two office condominium units, adjacent to each other, owned by the New England Legal Foundation (NELF), a corporation organized under G. L. c. 180 (1994 ed.). NELF's Articles of Organization proclaim that:

> "The specific and primary purposes for which this corporation is formed and for which it shall be exclusively administered and operated are: To receive, administer and expend funds for charitable and educational purposes in connection with the following:
>
>> "1. To provide legal representation for the citizens of the New England region, corporate or individual, and citizens of the United States on matters of public interest at all levels of the administrative and judicial process;
>>
>> "2. To engage in nonpartisan analysis, study, research and consultation for the benefit of the general public on those questions affecting the public interest, both with respect to the public and private sectors; and for no other purposes, to the express exclusion of any participation in or intervention in (including the publishing or distributing of statements) any political campaign on behalf of any candidate for public office."

The judge found, as the parties agreed by stipulation of facts, that NELF engages in no activities that are outside this charter description.

Beginning in 1993, NELF asserted tax-exempt status as a charitable organization, pursuant to G. L. c. 59, § 5, Third

(1994 ed.).[2] The city disagreed, claiming that NELF primarily conducted political activities and was therefore not entitled to tax exemption. Litigation ensued, with NELF bringing an action to recover back taxes (see G. L. c. 60, § 98 [1994 ed.]), and for declaratory relief. On cross motions for summary judgment and a motion for reconsideration, the Superior Court granted relief as to taxes paid in 1993 and 1994, while denying declaratory relief. The court denied NELF's motion for legal fees.

The parties cross appealed, and we granted an application for direct appellate review. Three issues are before the court: (1) whether certain procedural requirements prevent recovery in this case; (2) whether NELF is entitled to tax-exempt status; and (3) whether the court's denial of legal fees was proper.[3] We recount the appropriate facts as we take up each of these questions.[4]

1. *Procedural issues.* The city has availed itself of the Legislature's authorization for cities and towns to collect real property taxes on a quarterly basis rather than an annual or a semi-annual basis. G. L. c. 59, § 57C, inserted by St. 1989, c. 653, § 41. In each of the city's first two fiscal quarters, taxpayers receive preliminary bills in the amount of one-fourth of the previous year's tax. See *id.* (preliminary tax payments due in August and November). The city informs the taxpayer of the actual tax assessment for the year with the third quarter tax bill. See *id.* at fifth par. (actual tax bill mailed by December 31). Property owners pay the remaining

---

[2]General Laws c. 59, § 5, Third (1994 ed.), provides: "The following property shall be exempt from taxation. . . .

"Third, Personal property of a charitable organization, which term, as used in this clause, shall mean (1) a literary, benevolent, charitable or scientific institution or temperance society incorporated in the commonwealth, . . .; and real estate owned or held in trust for a charitable organization and occupied by it or its officers for the purposes for which it is organized . . .; provided however, that: —

"(a) If any of the income or profits of the business of the charitable organization is divided among the stockholders, the trustees or the members or is used or appropriated for other than literary, benevolent, charitable, scientific or temperance purposes or if upon dissolution of such organization a distribution of the profits, income or assets may be made to any stockholder, trustee or member, its property shall not be exempt."

[3]NELF has not appealed from the denial of declaratory relief.

[4]We acknowledge the assistance to the court of the amicus brief of the Conservation Law Foundation, Inc.

tax liability for the year (total assessment less the two preliminary payments already made) in equal installments in the third and fourth fiscal quarters. See *id.* (February and May payments).

In the city's fiscal year 1993, it sent quarterly tax bills to NELF, in the manner just described. When NELF received its actual tax assessment in the third quarter, it timely paid the accompanying bill. The payment was accompanied by a letter contesting the tax assessment, and NELF filed suit in the Superior Court in April, 1993.

The city continued to send quarterly tax bills. In the fourth quarter (May), NELF again made timely payment and in late July filed another lawsuit seeking recovery of taxes paid in fiscal year 1993. The Superior Court consolidated the two actions. Tax billing continued parallel with the litigation. NELF paid real estate tax bills for fiscal year 1994, although the record does not reveal any further lawsuits that were filed.

Both the April and July actions sought recovery, pursuant to G. L. c. 60, § 98, of taxes paid during fiscal year 1993. The city contends that two sections of the General Laws operate together to prevent recovery on procedural grounds. First, G. L. c. 60, § 98, states:

> "No action to recover back a tax shall be maintained, except as provided in sections sixty and eighty-five, unless commenced within three months after payment of the tax nor unless such a tax is paid either after an arrest of the person paying it, a levy on his goods, a notice of a sale of his land, a written protest signed by him, or a withholding of money due him under section ninety-three."

The city argues that NELF's April action fails to comply with § 98 because, at the time that suit was filed, NELF had paid only the first three quarterly tax bills and thus had not yet paid the entire tax due for the fiscal year. Thus the April action was not filed within "three months *after payment* of the tax" (emphasis added). *Id.*

Second, the city argues that NELF's July action does not lie because NELF commenced it more than ninety days after payment of the tax, in contravention of § 98. The city supports this position by citation to G. L. c. 59, § 57C, second par., which states:

"To the extent that any rights or remedies under law accrue from the date that the tax bill is issued, only the tax bill issued upon the establishment of the tax rate for the current fiscal year shall govern such rights and remedies."

This section arguably makes the third quarter tax bill (that follows the actual assessment) the only one from which filing periods may be calculated, and therefore the ninety-day period must run from the payment of that bill.

We recognize that the city is not asserting that NELF had no method by which to bring an action to recover back taxes paid; but the city reads the statute to require the taxpayer to make full payment of the entire tax at the time of the third quarter bill. Thus, it is said, both the full payment requirement of G. L. c. 60, § 98, and the third quarter time-calculation regime of G. L. c. 59, § 57C, second par., would be satisfied.

The problem arises from the relatively recent advent of a quarterly payment system for local taxes. Under the older annual and semi-annual billing regimes, the final (or only) payment of the year came due at the same time that the final tax assessment was sent to a property owner. The taxpayer who wished to file an action to recover back taxes would be able to pay the tax in the normal course and file a complaint within ninety days. Quarterly tax billing, however, provides the taxpayer with the final assessment in conjunction with the third quarter payment. In the normal course, the fourth and last payment would not be due for another three months. Thus, the question becomes whether, once the actual tax liability becomes known at the time of the third quarter billing, the taxpayer desiring to file an action to recover taxes must pay all the remaining tax at one time and file for an abatement within ninety days from that payment.

To interpret and harmonize the two relevant statutes, we look to "the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Telesetsky* v. *Wight,* 395 Mass. 868, 872-873 (1985). We examine background principles of both G. L. c. 60, § 98, and G. L. c. 59, § 57C, second par.

For most challenges to a tax bill, the taxpayer must resort to the administrative scheme, first seeking an abatement from the local board of assessors and then proceeding to the Appellate Tax Board. See, e.g., *Sears, Roebuck & Co.* v. *Somerville*, 363 Mass. 756, 757-758 (1973). See generally G. L. c. 59, §§ 59-74 (1994 ed.). Only after exhausting those remedies may recourse to the courts be had.[5] For a limited class of challenges, an action to recover back taxes will lie. The substantive argument that NELF makes, of complete tax exemption based on charitable organization status (see *infra*, part 2), could be brought pursuant to c. 60, § 98. See, e.g., *Massachusetts Soc'y for the Prevention of Cruelty to Animals* v. *Boston*, 142 Mass. 24, 25-26 (1886).

The ability to bring such a challenge, of course, might be disruptive of local government finances, because it is not a mere reduction that is sought (as in excessive assessment and valuation cases), but rather a complete voiding of the tax bill. Cf. *Leto* v. *Assessors of Wilmington*, 348 Mass. 144, 147 (1964). As a condition precedent to filing, the taxpayer must pay the tax bill, and then bring suit within ninety days. G. L. c. 60, § 98. The narrow window of time allows localities to obtain stability in their revenue flow because once a tax is paid, the locality will know soon thereafter whether the tax will be challenged.

As part of the Legislature's giving cities and towns the authority to collect local taxes on a quarterly basis, G. L. c. 59, § 57C, second par., attempts to harmonize the procedural schemes for tax administration with the new billing cycle. That new quarterly billing option provides localities in the Commonwealth with a steadier income stream than annual or semi-annual billing. Therefore, the touchstone of both § 98 and § 57C, second par., is ensuring a steady revenue flow to cities and towns.

Of course, cities and towns might enjoy having taxpayers settle tax liability early, with the third quarter bill, making both third and fourth quarter payments at the same time. Some taxpayers, however, might be dissuaded from challenging their tax bill because they would need to come up with additional funds if they wished to challenge a tax assessment,

---

[5]In a narrow set of circumstances, declaratory relief might be obtained. See *Sydney* v. *Commissioner of Corps. & Taxation*, 371 Mass. 289, 293-294 (1976).

paying the entire tax with the third quarter bill. There is no indication in the statute, however, that the General Court wanted to place such a severe disincentive on taxpayer challenges.

Furthermore, the likely consequence of the city's reading runs directly counter to the legislative intent, evident in both statutes, of providing a steady revenue stream. Taxpayers would not know that after receiving the actual assessment they must pay the remaining tax liability in a lump sum and then bring a recovery action within ninety days. At least some taxpayers, having budgeted to make the scheduled quarterly payments, might have difficulty raising the additional funds needed to complete payment at the time the third quarter bill is received. Those taxpayers might simply withhold payment until the fourth quarter bill, then make the lump sum payment (including a small amount of interest on account of the late third quarter payment), and bring their recovery action within ninety days. Nothing in § 98 prevents that action, for the suit must come within ninety days of the payment, not the bill. Nor does § 57C, second par., prevent this. By that paragraph's plain language the third quarter tax bill sets the date for *accrual* of causes of action and challenges to assessments.

The ninety-day window of § 98 is more than a statute of limitations. See *Wheatland* v. *Boston*, 202 Mass. 258, 259 (1909); *I.S.K. Con of New England, Inc.* v. *Boston*, 19 Mass. App. Ct. 327, 332 (1985). It is a jurisdictional prerequisite. We recognize that § 98 expressly demands some form of full payment of the tax as assessed within the ninety days immediately prior to the filing of an action to recover back taxes. At the same time, quarterly billing facilitates regular payment of taxes by property owners and a corresponding steady revenue stream for cities and towns. The General Court's intent is best effectuated by requiring full payment before suit, but allowing that full payment to occur in the ordinary course of quarterly billing. Of course, a taxpayer is free to accelerate payment, once the actual tax liability becomes known at the time of the third quarter bill, in order to bring the action more rapidly.[6]

This case presents two consolidated actions, one filed after

---

[6]One other possible procedural scheme is worthy of brief mention. It could be the case that § 98 requires a new lawsuit be filed after every

each of the third and fourth quarter payments. While NELF's first lawsuit could be dismissed for want of jurisdiction (because NELF had not yet paid the entire tax) the July action made the same demand for return of all taxes paid in fiscal year 1993. NELF filed that action within ninety days after it made its last (fourth quarter) payment. That action was properly before the Superior Court and can, at least procedurally, support relief for the entire tax year.[7]

2. *Charitable organization tax exemption.* We turn to the underlying substantive claim of exemption from local real property taxation. NELF asserts that it is a charitable organization within the scope of G. L. c. 59, § 5, Third (quoted in note 2, *supra*). The city counters that NELF is a "political" organization and thereby does not qualify for charitable, tax-exempt status.

The burden of proving entitlement to the exemption lies with the taxpayer. "Exemption from taxation is a matter of special favor or grace. It will be recognized only where the property falls clearly and unmistakably within the express words of a legislative command." *Massachusetts Medical Soc'y v. Assessors of Boston*, 340 Mass. 327, 331 (1960), quoting *Boston Chamber of Commerce v. Assessors of Boston*, 315 Mass. 712, 716 (1944). For purposes of local property tax exemption, the term "charitable" includes more than almsgiving and assistance to the needy. *Harvard Community Health Plan v. Assessors of Cambridge*, 384 Mass. 536, 543 (1981). We have developed what is a two-part test: "An institution will be classed as charitable if the dominant purpose of its work is for the public good and the work done for its members is but the means adopted for this purpose. But if the dominant purpose of its work is to benefit its members or a limited class

quarterly payment. This, however, would create additional confusion because the first and second quarter payments are based on only estimates of tax liability.

[7]The city also asserts that NELF did not make "written protest" as § 98 requires, because NELF's letters and other informal communication was addressed to the city assessor and not the city tax collector. We do not decide that issue today. In the parties' stipulation of facts the city agreed that "NELF has repeatedly claimed that it does not owe any real property taxes to the City because it is entitled to an exemption as a charitable organization under G. L. c. 59, § 5, Third. Copies of letters from NELF are attached hereto . . . ." The judge made an express finding to this same effect. Parties are generally held to their stipulations (see *Stuart v. Brookline*, 412 Mass. 251, 254-255 [1992]), and we so hold the city in this case.

of persons it will not be so classed, even though the public will derive an incidental benefit from such work." *Id.* at 544, quoting *Massachusetts Medical Soc'y, supra* at 332.

Evidence of that dominant purpose can come from a host of sources. The charter and by-laws of an organization are relevant, as are its activities. E.g., *Assessors of Boston* v. *Garland Sch. of Home Making,* 296 Mass. 378, 384 (1937). The organization's treatment under Federal and State tax schemes, the Internal Revenue Code (I.R.C.), 26 U.S.C. § 501 (c)(3) (1992) (Federal income tax) or G. L. c. 64H, § 6 (*e*) (1994 ed.) (State excise and sales taxes), is another indicator of charitable status.[8] The provision of low-cost or free services to those unable to pay is an indicator, albeit not a dispositive one, of charitable nature. See *Garland Sch. of Home Making, supra* at 389-390.

The umbrella for charitable organizations is broad, but not limitless. Perhaps the most significant class of nonprofit organizations that the law considers not charitable were recognized long ago — advocacy of immediate changes in the laws is not a charitable purpose. See *Jackson* v. *Phillips,* 14 Allen 539, 571 (1867). This doctrine maintains a separation between the courts and political controversy. The test for charitable nature is whether the organization works for the good of society. If courts had to determine if a particular organization, enmeshed in current political discourse, worked for the good of society, the court would implicitly comment on the desirability of legislation and political goals. Placing all political organizations outside the "charitable" fold relieves the judiciary from making that kind of commentary.

The parties agree that NELF's dominant purpose is to

---

[8]NELF is tax exempt from these taxes under both Federal and State law. We have commented that the requirements of § 501 (c) (3) and G. L. c. 59, § 5, Third, are "virtually identical." *Harvard Community Health Plan* v. *Assessors of Cambridge,* 384 Mass. 536, 538 n.3 (1981). The structure of the two provisions are the same. We note, however, that where Federal law expressly discusses activities and organizations that attempt to "influence legislation," the State provision has a judicially-recognized "political" organization exception plus the express exception of c. 59, § 5, Third (*a*). The political organization and activity doctrine has less to do with the usual tests for charitable status and activity than with preventing court entanglement with the active political process. As we discuss *infra,* today we need not embark on a path of adopting the detailed Federal rules and regulations of political organizations and activities under I.R.C. § 501 (c)(3)-(4) and the intricate safe harbor of I.R.C. § 501 (h).

conduct test-case litigation to advance a particular political agenda. From this factual premise the city contends that a program of test-case litigation attempts to effect immediate changes in the law, and therefore NELF is a political organization rather than a charitable one. That argument misapprehends the role of the courts. Courts interpret and apply law already enacted or made part of a constitution by appropriate means. A public interest law firm communicating with judicial officers (acting in their core capacity of deciding cases) does not attempt to change the law, but only aids the court in interpretation. Thus pro bono legal activities and legal services organizations generally aid in the vindication of legal rights. Assisting in test-case or other significant litigation is not political in the relevant sense.

NELF assists the inherently adversary judicial process, which must recognize both sides of an argument. NELF is not a vehicle for party politics. Compare *Workman's Circle Educ. Ctr.* v. *Assessors of Springfield,* 314 Mass. 616, 619 (1943). Nor does it seek enactment or repeal of statutory or constitutional provisions. Compare *Bowditch* v. *Attorney Gen.,* 241 Mass. 168, 172-173 (1922). To the extent that NELF "challenges" certain government acts, regulations, or statutes, it does so by seeking redress in the courts. That redress asks only for interpretation or the application of controlling statutory or constitutional provisions. In deciding that NELF is a charitable organization, we do not have to comment on the desirability of particular legislative goals. We do not have to approve of either side in a political debate.

For these reasons we agree with the judge below that NELF's test-case and other litigation work promotes the public good. But if that work is only incidental to benefits provided to members or some other limited class, NELF would not qualify for charitable organization tax exemption. See *Massachusetts Medical Soc'y, supra* at 332; *Young Men's Protestant Temperance & Benevolent Soc'y* v. *Fall River,* 160 Mass. 409, 411-412 (1894). That an organization's benefits go in whole or in large part to members who pay dues or fees suggests a mutual benefit society or private charity not entitled to tax exemption. See *Massachusetts Medical Soc'y, supra* at 332-333; *Boston Chamber of Commerce* v. *Assessors of Boston,* 315 Mass. 712, 719 (1944); *Young Men's Protestant Temperance & Benevolent Soc'y, supra* at 411. The city argues

that the litigants whom NELF will represent or assist (as amicus) are defined by a political outlook, and that is too limited a class to be a charity.

In *Harvard Community Health Plan, supra,* we did not set a precise number of persons that an organization must serve to claim charitable status. We have observed that although at any given moment an organization may serve only a relatively small number of persons, if that membership is fluid (compare *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston,* 294 Mass. 248, 255-256 [1936]) and is drawn from a large segment of society or all walks of life (see *Harvard Community Health Plan, supra* at 544), the organization may qualify as charitable. The record demonstrates, and the judge found, that NELF has represented, or filed amicus briefs in support of, a range of litigants from small homeowners to large corporations. NELF does rely on contributions, but the litigants it serves are not members.

The charitable organization tax exemption itself has several express statutory exceptions. The city asserts that even if NELF is a charitable organization (as we have concluded), then § 5, Third (*a*) applies:

> "*If any* of the income or profits of the business of the charitable organization is divided among the stockholders, the trustees or the members, *or is used or appropriated for other than literary, benevolent, charitable, scientific or temperance purposes* or if upon dissolution of such organization a distribution of the profits, income or assets may be made to any stockholder, trustee or member, its property shall not be exempt . . ." (emphasis added).

We have on only a few occasions discussed this portion of the statute. It is clear, at least by implication, that operating expenses of the charitable organization, even if they support further income production, do not invoke G. L. c. 59, § 5, Third (*a*), and thereby cause complete loss of tax-exempt status, so long as the resulting income is used for charitable purposes. See *Brockton Knights of Columbus Bldg. Ass'n* v. *Assessors of Brockton,* 321 Mass. 110, 113-114 (1947) (particular income-producing property may not be exempt despite charitable nature of taxpayer). Similarly, capital expenditures

that enable an expansion of charitable activities do not invoke this exception. See *Garland Sch. of Home Making, supra* at 393. We have not discovered any case in which an organization's expenditures fell within the "used or appropriated" language of G. L. c. 59, § 5, Third (*a*).

We leave for another day the question whether this language is either, as NELF and the amicus argue, a vestigial remnant that, as a result of long judicial interpretation, accomplishes no more than the primary requirement of literary, benevolent, charitable, scientific, or temperance purpose; or, as the city argues, the language prohibits the use or appropriation of a substantial part, or even any part of, a charitable organization's funding on political activities. Some other interpretation might be proper.[9]

It is true that a heavy burden rests on the taxpayer to demonstrate that the tax exemption for charitable organizations applies. In *Assessors of Boston* v. *World Wide Broadcasting Found.*, 317 Mass. 598 (1945), the by-laws of the charitable corporation made no provision regarding the assets in case of dissolution. We recognized that the burden generally rests on the taxpayer to show charitable status, but concluded that, when the charter and actions of a corporation demonstrated that a charitable purpose was intended, no additional disproof of any intent to distribute assets was necessary. *Id.* at 603-604. Whatever the meaning of "used or appropriated," the corporation having met its burden of showing charitable status, the judge below expressly ruled that the evidence, agreed and stipulated by both parties in this case, did not support the city's claim that NELF engaged in a relatively small amount of political activities.[10] There is no evidence in the appellate record of any expenditure for allegedly prohibited purposes, much less the sort of evidence that would

---

[9]Some early commentary hinted that the "used or appropriated" language was a residual clause to ensure that any form of attempted distribution by a charitable organization caused loss of tax-exempt status. See P. Nichols, Taxation in Massachusetts 244 (3d ed. 1938). Cf. *Harvard Community Health Plan, supra* at 541.

[10]The only evidence to which the city points is a single statement in NELF's 1993 annual report: "1993 was the year NELF *intensified involvement with state agencies* as a constructive means of protecting the region from regulations that could have threatened the economic free will of citizens and organizations" (emphasis in original). There is no particularized evidence of expenditures for such purposes.

cause us to conclude that the judge below had committed clear error. We agree with the judge that NELF has met its burden of demonstrating that its dominant purpose is to benefit more than a limited class, and that the organization is indeed entitled to tax exemption pursuant to G. L. c. 59, § 5, Third.

3. *Legal fees.* NELF asserts that it is entitled to legal fees pursuant to 42 U.S.C. § 1988 (b) (1996). That section provides in part that:

> "In any action or proceeding to enforce a provision of [various Federal civil rights laws], the court, in its discretion, may allow a prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

The judge denied fees on the ground that the case was "primarily related to tax issues and the non-profit charitable aspect of NELF."

We agree that in this case § 1988 cannot support an award of attorney's fees in light of the Supreme Court's recent decision of *National Private Truck Council, Inc.* v. *Oklahoma Tax Comm'n,* 515 U.S. 582 (1995).[11] That case holds that if there is adequate legal remedy to challenge State taxes, § 1983 cannot be used to obtain relief in either State or Federal court. See *id.* at 587-588. See also *Fair Assessment in Real Estate Ass'n, Inc.* v. *McNary,* 454 U.S. 100, 116 (1981). As a result, when an adequate State-law remedy exists, no attorney's fees are available pursuant to § 1988. *National Private Truck Council, Inc., supra* at 592.

The specific provision in this Commonwealth (the action to recover back taxes, see G. L. c. 60, § 98) applicable to NELF's challenges long ago was seen as providing an adequate remedy. See *Long* v. *Norman,* 289 F. 5, 7 (1923). Cf. *Leto* v. *Assessors of Wilmington,* 348 Mass. 144, 147-148 (1964); *Commonwealth* v. *Holmes,* 119 Mass. 195, 195-196 (1875). Several of our sister States have, since the *National Private Truck Council, Inc.,* decision, concluded that avenues similar to ours for tax challenges provide adequate remedies such that § 1983 cannot support challenges and that § 1988 cannot support fee awards. See *Jade Aircraft Sales, Inc.* v.

---

[11]We note that NELF's counsel appropriately has called this case, handed down after the decision below, to our attention.

*Crystal,* 236 Conn. 701, 706-710 (1996); *General Motors Corp.*
v. *Linden,* 143 N.J. 336, 344-350 (1996); *PPG Indus., Inc.* v.
*Tracy,* 74 Ohio St. 3d 449, 452 (1996) (per curiam). In the
present case NELF had adequate State procedural avenues to
bring its Federal law challenges to the property tax, and
§ 1983 would therefore not provide any relief. It follows that
the denial of attorney's fees was proper.

4. *Summary.* We conclude that the judge below was cor-
rect in requiring repayment of taxes paid for fiscal year 1993,
and in denying attorney's fees. One difficulty remains, because
after filing the July, 1993, action NELF continued to pay
quarterly tax bills through at least fiscal year 1994. No ad-
ditional lawsuit was filed after those payments. At the time,
however, NELF had its July, 1993, action pending, which
included a prayer that all taxes paid during the pendency of
the suit be repaid.

General Laws c. 60, § 98, requires a separate lawsuit for
each tax year. The proper procedural course is for a taxpayer
to continue regular payments and file a lawsuit within ninety
days after completing payment each year. This is normal
practice throughout the real estate taxation context: separate
requests for abatement must be filed for each tax year, which
the Appellate Tax Board consolidates when the case reaches
its level. See G. L. c. 59, § 59 (application for abatement
must be filed by various deadlines "in the year to which the
tax relates"). See also *Harvard Community Health Plan, supra*
at 536-537. In the tax administration scheme this usual
practice of filing timely each year is jurisdictional and strictly
construed. See, e.g., *General Dynamics Corp.* v. *Assessors of
Quincy,* 388 Mass. 24, 40 (1983) (abatement filing deadline is
jurisdictional); *I.S.K. Con of New England, Inc.* v. *Boston,*
19 Mass. App. Ct. 327, 332 (1985) (filing window for action
to recover back taxes is jurisdictional). Without a pending
lawsuit for a particular tax year, we have no authority to ap-
prove recovery of those taxes.[12] The July, 1993, action is
properly before us and seeks recovery of all taxes paid in the

[12]NELF cites *Norwood* v. *Norwood Civic Ass'n,* 340 Mass. 518 (1960), in
support of its position that to require an additional lawsuit for 1994 would
pose needless "circuity of action." See *id* at 524. That case is inapposite
because the plaintiff town's foreclosure action provided the court with juris-
diction over the res to which past and future taxes applied. The court could
therefore adjudicate with respect to future tax years, with the theory of
charitable tax exemption appearing as a defense. In the present situation we

city's fiscal year 1993. There is no proper action for the city's fiscal year 1994, therefore, the Superior Court judge improperly ordered repayment of those taxes.

The order of the Superior Court is modified by striking any language pertaining to fiscal years other than 1993. As modified, it is affirmed. The order denying the plaintiff's motion for award of attorney's fees and expenses is affirmed.[13]

*So ordered.*

---

exercise jurisdiction in a taxpayer's in personam action. We are not at liberty to disregard the General Court's authorization for the courts to consider actions to recover back taxes only when filed in strict accordance with G. L. c. 60, § 98.

[13]Given our conclusion that NELF is a tax-exempt chartiable organization, we need not take up the arguments that the distinction between charitable and political organizations is unconstitutional.